### MASSACHUSETTS SCHOOL OF LAW AT ANDOVER, INC.

v.

### AMERICAN BAR ASSOCIATION, et al.

Civ. A. No. 93–6206.

United States District Court, E.D. Pennsylvania.

Aug. 17, 1995.

See also 872 F.Supp. 1346.

Kenneth Hart, James Capra, Donovan Leisure Newton & Irvine, New York City, Lawrence R. Velvel, Michael L. Coyne, Andover, MA, Lee M. Epstein, Anderson Kill Olick & Oshinsky, P.C., Philadelphia, PA, for plaintiff.

Robert A. Burgoyne, Fulbright & Jaworski, Washington, DC, David T. Pritikin, David R. Stewart, Sidley & Austin, Chicago, IL, Barbara W. Mather, L. Suzanne Forbis, Pepper, Hamilton & Scheetz, Philadelphia, PA, Mark P. Edwards, Morgan, Lewis & Bockius, Philadelphia, PA, Scott A. Stempel, Morgan, Lewis & Bockius, Washington, DC, for defendants.

### MEMORANDUM AND ORDER

DITTER, District Judge.

## I. INTRODUCTION

This is an antitrust suit brought by the Massachusetts School of Law seeking treble damages arising from the failure of the American Bar Association to grant the school accreditation. MSL attached to its complaint a report bolstering the school's claims of merit. By an order dated June 27, 1995, I granted ABA's motion to compel Ansel Chaplin, MSL's "consultant on accreditation," to answer questions about, and provide documents related to the preparation of that report. MSL had objected to these discovery requests based on the attorney-client privilege. I concluded, however, that MSL had waived any privilege objection when it attached a copy of the report to its complaint.

MSL has filed a motion for reconsideration. It argues that my decision is not supported by the facts, not supported by the decisional authority that I relied upon, and "is contrary to basic principles as to waiver of privilege set forth in controlling Third Circuit precedent." The crux of MSL's argument is that the report was not itself privileged (because MSL always intended to make it public) and, therefore, when it relied on the unprivileged report in its complaint, MSL did not waive its privilege as to underlying, protected communications.[1] MSL's ar-

---

1. Apparently MSL starts out with the premise that because the report was prepared by an attor-

gument, that communications underlying a document can enjoy greater protection than the document that embodies those communications, rests upon a legal fallacy. MSL cannot protect underlying communications by the simple expedient of saying that it intended to make the report containing those communications public.[2]

## II. DISCUSSION

### A. *The Underlying Communications Were Never Privileged*

Although disputed by the ABA, I accepted for purposes of my order of June 27, 1995, MSL's assertion that Mr. Chaplin was acting as an attorney when he prepared the report. *See* Order, June 27, 1995, at n. 1. Upon reconsideration, I find that in addition to the fact that MSL would have waived its privilege had one existed, there never was any privilege.

■ The attorney-client privilege applies where: (1) the asserted holder of the privilege is or seeks to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, and (b) *in connection with this communication is acting as a lawyer;* (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) *for the purpose of securing either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding,* and (d) not for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not

waived by the client. *Rhone–Poulenc Rorer, Inc. v. Home Indem., Co.,* 32 F.3d 851, 862 (3d Cir.1994) (emphasis added).

In this case, the attorney-client privilege never existed for two reasons. First, Mr. Chaplin was *not* acting as a lawyer when he organized the visiting attorney committee and later drafted its report. Second, the communications underlying the report were not exchanged for the purpose of securing a legal opinion, legal services, or assistance in some legal proceeding.

### 1. Mr. Chaplin was not acting as a lawyer

■ As Chief Judge Joseph Lord, III, noted, in order for the privilege to apply, the "communication must be made by the client to the attorney acting as an attorney and not, *e.g.*, as a business advisor." *Barr Marine Prods. Co., Inc. v. Borg–Warner,* 84 F.R.D. 631, 634 (E.D.Pa.1979). Mr. Chaplin testified that he was retained as MSL's "consultant on accreditation." Chaplin Dep. at 16–17. In numerous correspondence he identified himself as MSL's "consultant on accreditation." Likewise, MSL referred to Chaplin in the minutes from its trustees' meeting not as its lawyer but as its "consultant." He never wrote a single legal opinion letter for MSL. Chaplin Dep. at 33. Moreover, notwithstanding MSL's contention that it employed Mr. Chaplin to guide it through an accreditation scheme "laden with procedure" and resembling a "labyrinth," before working for MSL, Mr. Chaplin had *never* served on an ABA accreditation inspection team or as a

---

ney, MSL could have claimed the report was protected by the attorney-client privilege had it chosen to do so. That being the case, the communications that contributed to its preparation would also be privileged. MSL agrees that the underlying communications would have lost their protected status if the report was placed in issue by being used to support its claim. But, MSL contends, it never intended to claim any attorney-client privilege for the report and therefore when it attached the report to the complaint, MSL waived nothing. Since the privilege is lost by waiver and there was no waiver, MSL maintains the underlying communications did not lose their privileged status.

**2.** Quite apart from the fact that the underlying communications are not legal in nature, the gossamer quality of MSL's legal argument is demon-

strated by the need for disclosure here. Not all the assertions contained in the report were observed by the visiting attorneys, and not all of the visiting attorneys' observations were contained in the report. For instance, the report notes that "our overall impressions of MSL were almost entirely positive." What some of the not entirely positive impressions were is not stated. Also, the report discusses aspects of the admissions process (p. 7), the school's finances (p. 12), the student computer training systems (p. 11), and the library (p. 11) that the visiting attorneys did not personally observe but instead were "told about." Who told the attorneys about these things and what exactly was told are proper areas for ABA inquiry. *See e.g.,* Deposition of Lawrence Velvel, Volume III, 64–65 (August 25, 1994).

consultant on ABA accreditation. In fact, it appears that prior to his work for MSL, Mr. Chaplin did not have *any* experience with the "procedurally laden" accreditation process. Chaplin Dep. at 20–23. Apparently, Mr. Chaplin secured his position not based on his reputation or skill as an attorney, but rather because of his close personal connection with some prominent members of the legal community who, it was thought, might assist MSL in becoming accredited.[3]

The nature of Mr. Chaplin's work, the way in which he referred to himself, the way MSL characterized him, and his prior experience establish that when Mr. Chaplin organized the visiting attorney committee and drafted its report, he was providing business services and not legal counseling. If the accreditation process was "quasi-judicial" in nature, if the procedures were so complex as to require guidance, if Mr. Chaplin (who had no prior experience with the complex procedures) was that guide, and if all that under some circumstances would have created an attorney-client relationship between MSL and Chaplin, that was not the case in this instance. Here, when Mr. Chaplin communicated with MSL about the visiting attorney committee, he did so not as a legal, but as a business advisor. Part of his job was to find "seven prominent New England attorneys" who would lend their names to the document that he and Mr. Velvel ultimately prepared. Chaplin Dep. at 36–40, 91. Since Mr. Chaplin was acting as a business advisor and not as a lawyer, neither the report nor the attendant communications are privileged.

### 2. Communications not exchanged for legal purposes

The privilege doctrine also does not apply for another reason: the communications underlying the report were not exchanged for the purpose of securing a legal opinion, legal services, or assistance in some legal proceeding. While the work of legal counsel should not be narrowly construed to include only trial related services, the administrative and networking services that Mr. Chaplin provided for MSL in connection with the visiting attorney committee were not legal in nature. As noted above, Mr. Chaplin never wrote a legal opinion letter. His job did not include offering MSL opinions of law. Although MSL has attempted to bring all communications with Mr. Chaplin under the attorney-client privilege by characterizing the accreditation process as a "quasi-judicial"[4] proceeding, Mr. Chaplin's work with the "seven prominent New England attorneys" was not work in a "legal proceeding." Therefore, because the communications underlying the report were not given for the purpose of securing a legal opinion, legal services, or assistance in some legal proceeding, neither the report nor the attendant communications are privileged.

### B. Had It Ever Existed, the Privilege Was Waived

Even if the communications between Mr. Chaplin and MSL regarding the visiting attorneys committee would have otherwise been protected under the attorney-client privilege, MSL waived the privilege when it attached to, and relied on the report in its complaint. In *Rhone–Poulenc*, 32 F.3d at 863, the Third Circuit held that the advice of counsel is placed in issue, and the privilege is thereby waived, where the client attempts to *prove* a *claim* or defense by *disclosing or describing* an attorney-client communication. The court reasoned that in these cases, "the client has made the decision and taken the

---

3. *See* Chaplin Dep. at 23–26. The minutes of an MSL trustees' meeting held on April 25, 1991, indicate that when a trustee asked Mr. Velvel how well Mr. Chaplin knew the ABA process, Mr. Velvel responded that although Mr. Chaplin did not have any experience with the accreditation process, Chaplin knew many of the upper echelon people in the ABA, including the outgoing and incoming presidents.

4. Quasi-judicial is a term applied to the action or discretion of public administrative officers or bodies, which are required to investigate facts, or ascertain the existence of facts, hold hearings, weigh evidence, and draw conclusions from them, as a basis for their official action, and to exercise discretion of a judicial nature. Black's Deluxe Law Dictionary 1245 (6th ed. 1990). The ABA is *not* a public administrative body and its actions are *not* official as would be the case with, for instance, actions taken by the Senate Judiciary Committee.

affirmative step in the litigation to place the advice of the attorney in issue." *Id.* Thus, in the instant case, had the privilege ever existed, MSL waived it when MSL attempted to prove a claim by disclosing the report.

1. MSL disclosed the report to prove a claim

In its complaint, MSL claims that it provides a quality law school education, is worthy of accreditation, and treble damages should be paid because accreditation has been denied. It attached and referenced the report to support this claim. Specifically, in addition to attaching the report, at paragraph 17 of the complaint, MSL states that "A report by prominent New England lawyers praising the School is attached as Exhibit A." Therefore, MSL disclosed the report in an attempt to prove its claim that accreditation was its due.

2. MSL's use of the report to prove a claim put the underlying communications in issue.

The report was not drafted by the visiting "prominent New England attorneys"; rather, Mr. Chaplin drafted it with substantial subsequent input from MSL's dean, Lawrence Velvel. In fact, it appears that Mr. Chaplin and Mr. Velvel may have exchanged a number of drafts of, made substantial changes to, and had numerous conversations about the report before it was finalized and submitted to the "prominent New England attorneys" for their signatures.[5]

The final version of the report was, therefore, mainly an amalgamation of the communications between Messrs. Velvel and Chaplin. The underlying communications between the two were the bricks and mortar from which the report was constructed and when the report was put into issue, so too were the communications. In other words,

when the report was attached to and relied on to prove the complaint, had there been any attorney-client privilege attached to the underlying communications, plaintiff would have put those communications into issue and thereby waived the privilege. Plaintiff cannot claim that some of the communications surrounding the report are privileged (those communications that did not make it into the final report) and some are not (those communications that did make it into the final report). As it is often said, the attorney-client privilege cannot be used as both a shield and a sword.

### III. CONCLUSION

After reconsidering my order of June 27, 1995, I find that no attorney-client privilege attached to the communications between Ansel Chaplin and MSL relating to the visiting attorney committee. In addition, I find that even if a privilege were to have attached to those communications, MSL waived the privilege when it affirmatively relied upon "the seven prominent New England attorneys'" report in its complaint. An appropriate order follows.

### *ORDER*

AND NOW, this 16th day of August, 1995, plaintiff's motion for reconsideration of my order of June 27, 1995, is hereby granted and, after reconsideration, the June 27, 1995, order is hereby affirmed.

---

5. The extent to which Messrs. Chaplin and Velvel communicated about the report is unclear because MSL has asserted the attorney-client privilege in response to almost all questions surrounding Mr. Velvel's involvement with the report. However, the record shows that Mr. Chaplin drafted the report, Mr. Velvel reviewed Mr. Chaplin's draft, Mr. Velvel made comments about the draft, Mr. Chaplin incorporated Mr. Velvel's comments into the report, and, in the end, the final report was substantially Mr. Velvel's product. *See e.g.,* Deposition of Ansel B. Chaplin 87–103 (September 29, 1994) (Chaplin drafted, Velvel reviewed, Velvel commented, comments were incorporated, final version was substantially Velvel's product); *Opposition of Plaintiff Massachusetts School of Law at Andover, Inc. to Motion of Defendant American Bar Association to Compel Compliance with Subpoena* at 5 (Chaplin drafted report).